[Nos. A108972, A110110, A110447. First Dist., Div. Two. Sept. 13, 2006.]

JEFFREY KOEHL et al., Plaintiffs and Appellants, v.
VERIO, INC., et al., Defendants and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part III., sections E., F., and G.

1314

COUNSEL

Thierman Law Firm, Mark R. Thierman; Hoffman & Lazear, H. Tim Hoffman and Arthur Lazear for Plaintiffs and Appellants.

Hale Friesen, Shannon M. Henderson and Daniel E. Friesen for Defendants and Respondents.

OPINION

**RICHMAN, J.**—Appellants are Jeffrey Koehl, Wendy Lingo, Terrence McCarthy, and John Brehm (when referred to collectively, Appellants), former sales associates at respondent Verio, Inc. (Verio). Appellants' compensation plans provided for base pay and commissions, which commissions were paid

when an order was booked, but which Verio could recover, or charge back, if certain conditions were not met. The fundamental question presented by this appeal is whether the commissions were wages, thus making the chargebacks unlawful under section 221 of the Labor Code. The trial court concluded that the commissions were not wages, and entered judgment for Verio. Our review leads to the same conclusion, and we affirm.

## I. Factual Background[1]

### A. *The Parties*

Verio is an Internet service provider that sells Internet access and Web hosting services. Its Internet access customers are predominantly businesses with high volume Internet needs that generally require the purchase and installation of equipment and hardware in order to obtain ongoing Internet access through fiber optic lines. In 2000, Verio was purchased by Nippon Telephone and Telegraph Corporation (NTT) and began doing business as NTT/Verio.

Appellants worked primarily as sales associates[2] for Verio between 1999 and 2002. Lingo began her employment in February 1999 as a sales associate and was a major sales associate when she left in May or June 2002. Brehm was a sales associate from July 2000 to September 2002. Koehl was employed from February 1999 to April 2002, first as a sales associate and later in key accounts development, which was, as he described it, "a program set up [where] they basically picked the top 10 or 14 reps in the country, started a new sales division that the main goal was to go out and hunt for

---

[1] This appeal follows a seven-day court trial held before the Honorable Robert Dondero, at which 12 witnesses testified and 73 exhibits were introduced. Following that, and review of the parties' proposed findings of fact and conclusions of law, Judge Dondero issued a 34-page statement of decision, supplemented by a five-page memorandum of decision adopting the court's tentative findings of fact and conclusions of law. Judge Dondero's decision was thoughtful, and it was thorough, addressing all aspects of the relationship between Appellants and Verio, including the documents Appellants signed, the policies and procedures which governed their compensation, the details of their compensation plans, pre- and post-employment discussions about those plans, and much more.

The facts are set forth against that background, and in accordance with the fundamental rules of appellate review, including that all evidence must be viewed most favorably to Verio and in support of the judgment. (*Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183]; *Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920, 925–926 [101 Cal.Rptr. 568, 496 P.2d 480]; see generally *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362].)

[2] The parties referred to both "Sales Associates" (or SA's) and "Account Executives" (or AE's) throughout the trial. The terms are apparently interchangeable and refer to the same position. We will use the term "sales associates" for consistency with the parties' briefs.

Fortune 500, Fortune 1,000, and any logo-type business." McCarthy, the only named plaintiff who did not testify at trial, was a sales associate from March 1999 until June 2001.

Sales associates earned base salaries, described as their "standard wage" or "base pay," of between $40,000 and $70,000 per year; this amount remained constant regardless of the number of deals they booked. In other words, sales associates earned their base salaries for performing their basic job duties as employees of Verio, and received that base salary every month regardless of whether they booked any business. In addition to their base salaries, sales associates also earned commissions on sales pursuant to a series of compensation plans described in detail below. They earned commissions for their results, i.e., for sales that resulted in revenue for Verio.

### B. *The Sales Process*

The duties of the sales associates involved typical sales functions, described by Verio as "identifying customers, building relationships, attempting to sell Internet service, booking deals, following up with customers to finalize sales, and serving as a point of contact for billing and service questions after a sale." When a sales associate obtained an order, he or she would submit to the provisioning department a service order form, a two-page form consisting of the customer's name, contact information, services being ordered, and terms of the agreement. At this point the order was "booked" and the sales associate received an advance payment for the anticipated commission, without verification that the customer was a real company, that the signature was authentic, or that the customer had the financial ability to pay. In short, booking the order did not include an assessment of the quality of the business, but was an administrative step to make certain that the order form was complete. Manager approval of an order was not required unless the order deviated from Verio's standard terms. After an order was booked, the provisioning department called the customer to arrange for installation.

### C. *Responsibilities After Booking*

Although the provisioning department was directly responsible for making sure that service was installed, the sales associates also had significant ongoing responsibilities with customers after an order was booked. They acted as a contact point with the customers, directed them to others within Verio on technical and billing issues, and served as problem solvers, all to the end of making sure that the orders were installed—and billing could begin. As Lingo explained it, she acted as the contact person if a customer encountered any problems, directing the customer to the appropriate department, such as customer service or billing and collections, for corrective

action. She had constant contact with customers to ensure that their system was up and running, playing a key role in maintaining the customer's happiness, which made them more likely to pay. The testimony of Brehm and Koehl was similar, as shown by that of Brehm:

"Q: After you booked a deal and you were advanced the commission, it was part of your job, was it not, to make sure that the customer was happy after booking?

"A: Correct.

"Q: And so that they would install the business after booking it; correct?

"A: Yes.

"Q: And that they would actually start making the payments; correct?

"A: Yes.

"Q: You would do whatever you could to resolve any customer problems?

"A: Correct.

"Q: And that was part of your job, to stay in touch, resolve problems, make sure the business started paying; correct?

"A: Correct.

"Q: All that's after the booking; right?

"A: Correct."

D. *The Compensation Plans*

Central to the issues in this case were the compensation plans, typically called the "Sales Associate Compensation Plan," which governed the manner in which sales associates were paid by Verio. And more specifically central were the portions of the plans concerning commissions and chargebacks, which are set forth in detail here for the years 1999 to 2002.

1. *The "1999 Sales Compensation Plan"*

The "1999 Sales Compensation Plan" contained a section entitled "Monthly Revenue Commissions" (§ 2.6) that explained the calculation of

commissions due sales associates: "This incentive, compensation components are calculated based on the total amount of recurring revenue booked for the accounting month. [¶] . . . [¶] **Commission:** 50% of the eligible commission will be paid on the last pay period of the next month after the sale booking, with the balance due upon installation of the customer circuit (assumed to occur no later than the last pay period of the second month after sale booking). Commissions for bookings with expected installation date of 60 days or longer from the booking date will be paid 50% at circuit order and 50% at installation."

Pertinent to the chargebacks at issue here, section 3.6 of the 1999 plan, "Account Cancellation Charge Back," provided as follows:

"VERIO, Inc.'s Sales management has the right to impose a charge back on all accounts canceled with 270 days of activation.

"The charge back will be:

"Prior to billing to 60 days after 100% charge back
60–180 days after billing 75% charge back

"Charge backs will be treated as a reduction in revenue credit in the month following the account cancellation."

### 2. The "2000 Direct Sales Compensation Plan"

The "2000 Direct Sales Compensation Plan" provided, in section 2.5 on "Commissions," that if a sales associate met 50 percent of his or her quota, the commission would be between 50 percent and 100 percent of the monthly recurring revenue, defined in section 2.2 as "the amount agreed to be paid by the customer per month for the particular service desired . . . ." It further provided, as to "When Commissions are Paid: [¶] Verio has two paydays per month; the first is the 15th, and the second is the last day of the month. If the installation is expected to occur within 60 days after the Order is booked, the full commission will be paid on the second payday of the month following the month the Order was booked. If the installation is scheduled or contracted to occur more than 60 days after the Order is booked, 50% of the commission will be paid on the second payday of the month following the month the order was booked and the remaining 50% of the commission will be paid on the next payday following the installation date. A supervisor has the discretion to require that a commission not be paid until installation in those circumstances that require a supervisor's approval before allowing the sale to be made (a low margin sale, a significant discount given, etc.). Please note that Verio is paying commission in some instances prior to when the

commission is actually earned, which does not occur until the service or product has been delivered, accepted and payment has been received by Verio."

The plan provided in section 3.6, "Account Cancellation: [¶] Verio's management has the right to seek reimbursement for any commission paid for any account canceled prior to billing and up to 90 days after activation of the service. The reimbursement will come out of the [sales associate's] commission in the month following the account cancellation."

### 3. *The "2001 Sales Associate Compensation Plans"*

The record contains two different compensation plans for 2001.[3] In the "2001 Sales Associate Compensation Plan" dated January 1, 2001, section 3.5 on "Commissions" provided: "A commission is defined as the percentage amount of Monthly Recurring Revenue and Monthly Non-Recurring Revenue that the [sales associate] is entitled to receive. The percentage amount of monthly revenue the [sales associate] is eligible to receive is based on how close the [sales associate] is to reaching the Assigned Quota, using a percentage figure. Commissions are based on the total revenue brought in on new orders booked for each month. . . . Commissions are not earned until after three (3) months of Monthly Recurring Revenue payments have been received; however Verio will begin paying Commissions before they are actually earned."

In section 3.6 on "Commission Payments," the plan again noted: "Verio is paying Commission prior to when the commission is actually earned, which does not occur until the service or product has been delivered, accepted and payment has been received by Verio for three (3) months."

Section 4.5, "Account Cancellation 'Chargebacks' " provided: "Verio management has the right to seek reimbursement for any Commission paid for an account cancelled prior to receiving three (3) full months of Monthly Recurring Revenue payments from the customer. The reimbursement will come out of the [sales associate's] Commission in the month following the account cancellation."

The 2001 Sales Associate Compensation Plan dated May 1, 2001, was identical as far as sections 3.5 and 3.6 concerning the payment of commissions. However, section 4.5, "Account Cancellation 'Chargebacks' " now

---

[3] It appears from the record that only one of the 2001 compensation plans was introduced at trial, though both 2001 plans were made a part of the clerk's transcript. However, because the trial exhibits were not designated as part of the record, we cannot ascertain which 2001 compensation plan was introduced. We therefore set forth the pertinent portions of both plans.

provided: "Verio Management has the right to seek reimbursement for any Commission paid for an account cancelled prior to receiving three (3) full months of Monthly Recurring Revenue payments from the customer. This reimbursement is referred to as a 'Chargeback.' By signing below, Verio has the right to deduct from a [sales associate's] future paycheck any chargeback Verio is owed."

### 4. The "2002 Sales Associate Compensation Plan"

The material terms of the "2002 Sales Associate Compensation Plan" were the same as the material terms in the 2001 plans, except that in 2002, Verio began paying commissions upon installation, rather than at booking: "A commission is defined as the percentage amount of Monthly Recurring Revenue and Non-Recurring Revenue that the [sales associate] is entitled to receive for an installed product. The percentage amount of monthly revenue the [sales associate] is eligible to receive is based on the profitability of the sale. Commissions are based on new orders and upgrades installed for each month."

The 2002 plan also expressly stated, in section 4.6, "Account Cancellation 'Chargebacks,'" that Verio could deduct chargebacks from any source: "NTT/Verio management has the right to seek reimbursement for all commissions paid for an account canceled for any reason prior to receiving three (3) full months of Monthly Recurring Revenue payments from the customer. This reimbursement is referred to as a 'Chargeback.' *By signing below, the [sales associate] authorizes any Chargeback owed under this or previous compensation plans to be deducted from the [sales associate's] future paycheck, including salary and commissions, severance pay, right to receive cash payments, and vacation pay upon separation from NTT/Verio.*"

Each plan contained a final section entitled "Plan Acknowledgment," which required the employee's signed acknowledgment that he or she had read, understood, and agreed to the plan. All Appellants signed all acknowledgements.

Each time there was a new commission plan, Verio provided a written copy of it to the sales associates, reviewed it with them, and conducted both formal and informal training on how it operated. Michael Mickley, a global accounts manager for NTT/Verio, described the meetings in which management presented the plans to the sales associates: "Basically what would happen is we'd get a PowerPoint and highlight areas of the compensation plan for the [sales associates]. And so, typically, what would happen is we'd go over this with everybody in a meeting and it was everybody was in attendance. . . . And essentially we would go over the highlights of all of the compensation

plan. [¶] At that point, what we would do is send out the compensation plan to all of the [sales associates]. And the compensation plan usually included everybody on that. And at that point the [sales associates] would get with management if they had any questions, any concerns, anything that was— would, quote-unquote, raise a red flag in their mind that they wanted to discuss with either upper management and/or HR." As to whether the issue of chargebacks came up at these presentations, Mickley responded, "Every time." Mickley also testified that the issue of chargebacks was even raised with applicants during the interview process, before the individuals were hired as sales associates.

Lingo, Brehm, and Koehl all testified that they received and read the plans, had the opportunity to ask questions about them, understood them, and signed them. And all three of them understood that the compensation plans governed the terms of their compensation.

Moreover, Appellants all admitted that Verio paid them in advance of when the commissions were earned, and reserved the right to recover those advance payments if the conditions for earning the commissions did not occur. For example, Lingo admitted that she was only entitled to wages she earned, and if a commission was not earned, she was not entitled to it. Her specific understanding was that "the commission [she] earned was a percentage of the revenue that Verio ultimately collected"; and, she said, if a deal canceled before it installed, she would not earn a commission on that deal. And Lingo understood, just as confirmed by the plans, that Verio paid commissions prior to when the commission was actually earned.

Brehm's testimony was the same, and could not have been more clear:

"Q: Let me ask you some questions about earning commissions under those plans. First, you're not claiming any money from Verio that you did not earn; correct?

"A: Correct. [¶] . . . [¶]

"Q: . . . Your understanding of the plan is that commissions were not earned until the sales generated revenue; correct?

"A: Correct. [¶] . . . [¶]

"Q: And your understanding of the comp plan is that you need three months of that recurring revenue before you earn a commission; correct?

"A: I learned that, yes.

"Q: And there's nothing about that that was ambiguous to you; correct?

"A: Correct.

"Q: And you understood that Verio actually paid you a commission payment before they were earned under that three months recurring revenue; correct?

"A: Correct.

"Q: So in a sense they were paying you in advance of when it was earned; correct?

"A: Correct.

"Q: Now, it was also your understanding, was it not, that if you sold something and that you were advanced money at booking but then that order cancelled, that Verio could take the money back that it had advanced; correct?

"A: Correct."

### E. Reasons for Verio's Commission Structure

Michael Linos joined Verio in January 1999, as vice-president of sales in charge of the Southern California region, a position he held for some 18 months before being promoted to vice-president of sales of the western region. In January 2002, he was again promoted, this time to vice-president of sales of enterprise hosting, a position he held until his employment with Verio ended on December 31, 2002. Linos was involved in the preparation of the 2000, 2001, and 2002 compensation plans, and explained the reasons behind Verio's advancing commission payments while requiring three months recurring revenue before the commissions were earned. First, three months of consecutive payment was the industry standard at the time for the payment of commissions. Second, it took approximately six to seven months of recurring revenue for Verio to begin to recover its costs. Third, advancing payment at booking and then requiring three months of recurring revenue created the right incentives for the sales associates to provide followup with the customer, to improve the likelihood that the customer would actually pay.

At the same time, advancing commissions was considered particularly attractive by the sales associates, as confirmed by Koehl, who acknowledged that one of the attractions of working at Verio as opposed to other companies was that the sales associates received their commissions at booking, rather than waiting to see if the booking actually generated revenue.

Linos also explained that Verio's commission plan created a self-policing mechanism which he called a "self-checking plan." That is, paying commissions at booking, while reserving the right to charge it back if the sale did not generate revenue, eliminated the need for Verio to scrutinize every order at the time it was booked to determine whether it was "good business." And this self-policing feature of the commission plans was justified by the potential for abuse by sales associates, manifest by the evidence indicating that Verio paid several commissions on questionable orders. Notably, while McCarthy *himself* did not testify at trial, there was significant testimony *about him*, especially on the issue of questionable orders. Michael Bowers, an executive from linkLINE, an Internet service provider and potential Verio customer, testified that McCarthy urged Bowers to sign what he represented to be a letter merely expressing linkLINE's interest in purchasing bandwidth from Verio in a region around Ontario, California, commonly referred to as the Inland Empire. Bowers prepared a letter indicating that a fictional entity named Newco, meaning "new company," would buy bandwidth if Verio was able to provide it. LinkLINE did not place an order for services with Verio, yet McCarthy received commissions on the Inland Empire sales.

Jason Cavalli, a sales associate with Verio since February 2000, testified that McCarthy, his sales manager, encouraged him to "[j]ust get the deals signed." According to Cavalli, a coworker asked McCarthy if he felt bad booking business that would never get installed, to which McCarthy responded, "Just get the business installed. Verio won't charge you back. I've made a lot of money where business hasn't installed." Cavalli also testified that on a different occasion, McCarthy and Koehl contacted him about putting together a "bogus deal" just to get a deal booked before the end of the month, to the point that McCarthy insisted that Cavalli forge a contract. Cavalli refused, but confirmed that the order was nevertheless booked despite his refusal to submit it.

Deanna Tymochko, who began employment at Verio in 1998 as a customer installation coordinator and was twice promoted to become international deal coordinator, also testified about suspicious bookings. According to Tymochko, on one occasion Koehl asked her not to cancel a deal with Page One Communications, which was experiencing legal problems that eventually led to the arrest of the owner, because Koehl knew he was going to be charged back for it. Koehl also kept adding additional services onto the original order, despite the fact that Page One Communications was not proceeding with installation on the original order.

### F. *The Chargeback Process*

Vinnie John, who held the positions of finance manager, manager of billing and accounting, and commission manager prior to being laid off in June

2003, testified regarding the administration of chargebacks. As he explained the chargeback process, when an installation order cancelled before the customer paid for the first three months, Verio recovered its previous commission payment on that transaction by reducing the advance commission payments in a subsequent month. The amount of each chargeback was the same amount the sales associate had been previously advanced for the installation in issue.[4] Verio effectively reversed the transaction for the specific sales associate for the specific customer order on which Verio had previously paid the commission; "it's basically an undoing of that transaction." John confirmed that Verio sought recovery of the advanced commission payments only from subsequently earned commissions, never from a sales associate's base pay. And the chargeback was applied only to the particular sales associate who booked the order.

Although the terms of Verio's 2000–2002 commission plans provided that the company could collect chargebacks on any order that cancelled before Verio received three months of revenue, approximately 90 percent of the chargebacks were on deals where the orders were cancelled before the services were ever installed, and thus before Verio received any revenue at all.

Mickley, the global accounts manager, also testified about the chargeback process: "Essentially what would happen is I would get a report on a monthly basis of booked deals, and then I would also get on that very same report charged back deals. And essentially what we would do is we'd have an undetermined amount of time, usually about 30 days to get with the [sales associates] and get with all the appropriate people to make sure, number one, that is a valid chargeback; and, number two, that, you know, we should be proceeding with the chargeback to the [sales associates]. We did that every single month with every single employee that was commissioned." Mickley explained that the sales associate then had an opportunity to dispute the chargebacks, whether for administrative reasons, clerical errors, or errors related to fault. Often, if the sales associate demonstrated that Verio was at fault for the failure to install, the chargeback did not occur.

Chargebacks were widely discussed with Appellants and the other sales associates. Mickley testified, for example, that Lingo discussed chargebacks with him on a regular basis, asking for the reports reflecting the proposed chargebacks in advance of when they were normally received and then trying to sell more revenue to offset the amount of chargebacks for that particular month. Likewise, Linos confirmed that he had many conversations with Koehl and McCarthy regarding chargebacks, including a situation where

---

[4] Until 2003, Verio's policy was to reduce commission advances by no more than 50 percent under what it referred to as the "50 percent rule."

Verio agreed to a payment plan allowing Koehl to pay back a very large chargeback over time, ultimately waiving about half of the payment for "the good will of the employee."

Sales associates also had access to information about whether their customers had paid the required three months' revenue. This information was provided either by access to people in Verio's billing and provisioning departments or later through direct access to Verio's billing information system. Appellants and other sales associates inquired about and monitored customer payment history in connection with their regular review of charge-backs and potential chargebacks.

## II. Procedural Background

On August 16, 2002, Appellants filed a class action and representative complaint for restitution of wages (chargebacks), alleging that Verio violated the Labor Code by charging back previously paid commissions when a sale failed to generate revenue. The complaint alleged three causes of action: (1) commission chargebacks in violation of Labor Code sections 221, 223, 225 and 400–410[5]; (2) waiting penalties pursuant to section 203; and (3) unfair competition under Business and Professions Code section 17200 et seq.

On November 14, 2002, Verio filed an answer and also a cross-complaint to recover what Verio referred to as an "overpayment of unearned commissions."

On February 14, 2003, Appellants moved for class certification which, over opposition, was granted by order dated April 16, 2003, certifying as a class "all sales people who Defendant 'charged back' commissions paid from four years prior to the filing of [Appellants'] complaint to the date of judgment after trial herein."

On July 20, 2004, trial commenced before Judge Dondero and concluded on July 28, 2004. On September 3, 2004, the parties submitted proposed findings of fact and conclusions of law, and on September 22, 2004, Appellants submitted opposition to Verio's proposed findings and conclusions.

On December 7, 2004, Judge Dondero issued his tentative findings of fact and conclusions of law, tentatively finding in Verio's favor on both the complaint and the cross-complaint. He also tentatively concluded that as the prevailing party Verio was entitled to attorneys' fees pursuant to section 218.5, and ordered Verio to submit a declaration of attorneys' fees and

---

[5] All statutory references are to the Labor Code unless otherwise noted.

interest. On January 4, 2005, Appellants filed a notice of appeal from the tentative findings of fact and conclusions of law (appeal No. A108972).

On January 6, 2005, Verio filed a declaration of Daniel D. Friesen regarding attorneys' fees and interest. Friesen, counsel for Verio, detailed the attorney and paralegal time spent on each component of the case up through posttrial work, with documentation, supporting attorneys' fees in the amount of $548,076.66. Friesen's declaration also contained a calculation of interest owed by McCarthy, Koehl, and Brehm on the overpaid commissions from the date of their respective terminations until an estimated judgment date of January 15, 2005. On February 2, 2005, Appellants filed opposition, challenging only Verio's entitlement to attorneys' fees, not the fees themselves. Verio filed a reply. On March 24, 2005, Judge Dondero heard Verio's request for attorneys' fees and interest, and by order of April 6, 2005, awarded Verio $548,076.66, as the prevailing party under section 218.5. Judge Dondero also awarded Verio prejudgment interest in the amount of $50,351.86, allocated among McCarthy, Koehl, and Brehm. On April 25, 2005, Appellants filed a notice of appeal from order granting defendant Verio's motion for attorneys' fees (appeal No. A110110).

Meanwhile, on February 1, 2005, Judge Dondero entered his statement of decision and findings of fact and conclusions of law, accompanied by a memorandum of decision adopting the court's tentative findings of fact and conclusions of law. On February 28, 2005, Appellants moved for judgment notwithstanding the verdict, which Verio opposed, and which we presume Judge Dondero denied, though the ruling is nowhere in the record.

On May 4, 2005, Judge Dondero entered judgment following court trial in favor of Verio and against Appellants on both the complaint and the cross-complaint, the latter awarding Verio damages of $31,536.13 against McCarthy, $31,199.15 against Brehm, and $161,667.43 against Koehl. The judgment also provided that Appellants were jointly and severally liable to Verio for $548,076.66 in attorneys' fees.

On May 11, 2005, Appellants filed a timely notice of appeal from judgment following court trial (appeal No. A110447).

On August 30, 2005, we ordered Appellants' three appeals consolidated for purposes of briefing, oral argument, and decision pursuant to the stipulation of the parties.[6]

---

[6] Verio does not challenge the appealability of the tentative statement of decision or the order granting defendant Verio's motion for attorneys' fees. The former is clearly a nonappealable order, and we thus dismiss appeal No. A108972 on our own motion. We note that the

## III. Discussion

### A. *Summary of Appellants' Position*

Appellants's opening brief contends that Judge Dondero "erred" in eight particulars, numbered as follows: (1) in finding that Verio's commission plans did not violate section 221; (2) in finding that Verio's commission plans were lawful under section 224; (3) in finding the acknowledgment constituted a contract between Verio and its employees; (4) in failing to recognize that consent is not possible because section 219 prohibits and nullifies any agreement contrary to section 221; (5) in applying a "legislative purpose" analysis to a statute that is clear on its face; (6) in finding that the chargebacks were against new advances, not earned commissions; (7) in failing to recognize that, if a contract did exist, it was an unconscionable contract; and (8) in relying upon an unpublished decision in violation of California Rules of Court, rule 977(a).

As we explain, none of Appellants' contentions has merit. The determination of the fundamental question of the enforceability of Verio's commission plan disposes of contentions numbered 1, 3, 4, and 6. Contention number 2 is simply wrong. Contentions numbered 5 and 8 could not be grounds for reversal. And contention number 7 was not even urged below and, in any event, is groundless.

### B. *Verio's Chargebacks Did Not Violate Section 221*

■ The pertinent statutes are found in division 2 of the Labor Code (§ 200 et seq.) entitled "Employment Regulation and Supervision," which begins with the definitions in section 200: "As used in this article: (a) 'Wages' includes all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation. [¶] (b) 'Labor' includes labor, work, or service whether rendered or performed under contract, subcontract, partnership, station plan, or other agreement if the labor to be paid for is performed personally by the person demanding payment." (Stats. 1937, ch. 90, § 200, pp. 185, 197.) Thus, commission payments can be wages under the express description of section 200 and applicable cases. (*Hudgins v. Neiman Marcus Group, Inc.* (1995) 34 Cal.App.4th 1109, 1118 [41 Cal.Rptr.2d 46] (*Hudgins*) ["Commissions are wages within the meaning of section 221. (§ 200.)"]; *Reid v. Overland Machined Products* (1961) 55 Cal.2d 203, 207–208 [10 Cal.Rptr. 819, 359 P.2d 251] [holding commissions are "wages"].)

---

issue of attorneys' fees can be raised on the appeal from the judgment, though as discussed *post* nowhere in their opening or reply briefs do Appellants make any argument as to the award of attorneys' fees.

If the commissions at issue here are wages, then Verio's attempt to recover them could run afoul of section 221, which provides in its entirety that "[it] shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee." Section 221 is, of course, the basis of Appellants' fundamental contention below, and here, a contention necessarily premised on a determination that the commissions were wages. Judge Dondero concluded they were not. We agree with Judge Dondero.

■ The right of a salesperson or any other person to a commission depends on the terms of the contract for compensation. (*Steinhebel v. Los Angeles Times Communications, LLC* (2005) 126 Cal.App.4th 696, 705 [24 Cal.Rptr.3d 351] (*Steinhebel*); *Commeford v. Baker* (1954) 127 Cal.App.2d 111, 117 [273 P.2d 321] (*Commeford*). And "it is clearly the law in California that a sales[person] is required to repay the excess of advances made over commissions earned when there is an express agreement on the part of the sales[person] to repay such excess." (*Agnew v. Cameron* (1967) 247 Cal.App.2d 619, 622 [55 Cal.Rptr. 733], citing *Korry of California v. Lefkowitz* (1955) 131 Cal.App.2d 389, 391–392 [280 P.2d 910] (*Korry*).)

*Steinhebel, supra,* 126 Cal.App.4th 696, recently confirmed that agreements between employer and employee concerning commissions have long been an established—and accepted—business practice, as indeed it has, manifest by various opinions over the years, both from courts and from the Division of Labor Standards Enforcement (DLSE).

*American Software, Inc. v. Ali* (1996) 46 Cal.App.4th 1386 [54 Cal.Rptr.2d 477] (*American Software*), an opinion by Division Five of this court, is representative. The issue there involved a provision of a software salesperson's employment contract which terminated her right to receive commissions received on her accounts 30 days after severance of employment. The trial court found the provision unconscionable. (*Id.* at p. 1388.) The Court of Appeal reversed and, finding the contract enforceable, first noted that there were no unclear or hidden terms in the employment agreement, and no unusual terms that would "shock the conscience." (*Id.* at p. 1394.) Moreover, the court noted, its "survey of case law indicates that the contract provision challenged here is commonplace in employment contracts with sales representatives . . . who have ongoing responsibilities to 'service' the account once the sale is made." (*Id.* at p. 1393, citing *Chretian v. Donald L. Bren Co.* (1984) 151 Cal.App.3d 385, 389 [198 Cal.Rptr. 523]; see *J.S. DeWeese Co. v. Hughes-Treitler Mfg.* (Mo.Ct.App. 1994) 881 S.W.2d 638, 644–646; *Entis v. Atlantic Wire & Cable Corporation* (2d Cir. 1964) 335 F.2d 759, 762.)

Along the same lines is *Powis v. Moore Machinery Co.* (1945) 72 Cal.App.2d 344 [164 P.2d 822], which reversed a judgment for the plaintiff

awarding him commissions. Doing so, the court upheld the validity of a commission plan that required the customers to pay for goods as a condition precedent to the salesperson earning the commission. The salesperson had post-delivery responsibilities, and the court held that conditioning payment of commissions on receipt of payment from customers did not deprive the plaintiff of any commission "which he had already earned since it related [in part] to services to be performed in the future." (*Id.* at p. 354.) Other cases include *Prudential Ins. Co. v. Fromberg* (1966) 240 Cal.App.2d 185 [49 Cal.Rptr. 475], where the plaintiff employer obtained a declaratory judgment that upon termination of the defendant's employment as the plaintiff's agent, the employer was entitled to retain certain sums advanced to the defendant under two salary plans; *Division of Labor Standards Enforcement v. Dick Bullis, Inc.* (1977) 72 Cal.App.3d Supp. 52, 57 [140 Cal.Rptr. 267], where the employee had postorder responsibilities necessary to complete the sale, and the court affirmed a judgment for the defendant on the basis that "the right of the salesman to commissions is dependent upon the terms of his contract for compensation"; and *Korry, supra,* 131 Cal.App.2d 389, 393, which allowed recovery of excess advances over earned commissions where the agreement specifically provided employees would have weekly advances that would be charged against commissions.

In sum, cases have long recognized, and enforced, commission plans agreed to between employer and employee, applying fundamental contract principles to determine whether a salesperson has, or has not, earned a commission. Two cases from the Second District Court of Appeal have recently addressed the issue, which cases are extensively cited by the parties. The first is *Steinhebel, supra,* 126 Cal.App.4th 696, relied on by Verio; the second is *Harris v. Investor's Business Daily, Inc.* (2006) 138 Cal.App.4th 28 [41 Cal.Rptr.3d 108] (*Harris*), relied on by Appellants. We discuss them in turn.

*Steinhebel,* decided by Division Eight of the Second District, was an action by former telesales employees of the defendant newspaper publisher, whose primary job was to telephone prospective customers to attempt to sell newspaper subscriptions; they also telephoned existing customers with limited subscriptions to attempt to sell them broader ones. (*Steinhebel, supra,* 126 Cal.App.4th at p. 700.) The employees had a telesales agreement under which a sale of a subscription did not qualify as a commissionable order unless the customer kept the subscription for 28 days. The employees nevertheless received advances before the defendant could determine whether the order would in fact ripen into a commissionable order. (*Id.* at pp. 701–702.)

The plaintiffs filed a three-count complaint seeking relief under sections 203, 221, 225, 400 through 410, and Business and Professions Code, section

17200. (*Steinhebel, supra,* 126 Cal.App.4th at p. 702.) The defendant moved for summary judgment, which the trial court granted, ruling that, although the commissions were earned at the time the work was complete, the commissions were subject to a 28-day condition precedent. (*Id.* at p. 703.)

■ The Court of Appeal affirmed, framing the issue and its holding as follows: "we are presented with the issue whether an employer may advance commissions to its employees and then by agreement charge back any excess of advances over commissions earned against future advances. As we discuss below, we hold an employer may legally advance commissions to its employees prior to the completion of all conditions for payment and, by agreement, charge back any excess advance over commissions earned against any future advance should the conditions not be satisfied." (*Steinhebel, supra,* 126 Cal.App.4th at p. 704.)

Reaching that holding, the Court of Appeal relied on facts and law manifestly applicable here: "Appellants executed acknowledgements indicating they read and understood the Agreement, which specified that commissions were payable only on commissionable sales, i.e., subscriptions that were verified sales and were kept by the customer for at least 28 days. Appellants's right to commissions therefore must be governed by the provisions of the Agreement. (*Lucian v. All States Trucking Co.* (1981) 116 Cal.App.3d 972, 975 [171 Cal.Rptr. 262] [employees who voluntarily left employment before end of accounting period not entitled to pro rata share of profits under bonus incentive plan requiring employee to work the entire accounting period before benefits vested]; *Commeford[, supra,]* 127 Cal.App.2d 111, 117 . . . [employees' right to commission determined by terms of their contract].) '[T]he right of a salesman or any other person to commissions under given circumstances depends upon the terms of his contract for compensation.' (*Commeford* at p. 118.)" (*Steinhebel, supra,* 126 Cal.App.4th at p. 705.)

■ "The essence of an advance is that at the time of payment the employer cannot determine whether the commission will eventually be earned because a condition to the employee's right to the commission has yet to occur or its occurrence as yet is otherwise unascertainable. An *advance,* therefore, by definition is not a *wage* because all conditions for performance have not been satisfied." (*Steinhebel, supra,* 126 Cal.App.4th at p. 705.)

We find *Steinhebel* persuasive here. Indeed, the subject setting is a fortiori, as in *Steinhebel* the salespersons had no further responsibilities after the sale. (*Steinhebel, supra,* 126 Cal.App.4th at p. 706.) As described at length above, Appellants admitted that they had postbooking responsibilities necessary to earn their commissions: they serviced accounts, acted as liaisons with customers, responded to questions, solved customer problems, and directed customers to the appropriate people at Verio.

Thirteen months after *Steinhebel, supra,* 126 Cal.App.4th 696 and after Verio's respondent's brief was prepared, Division Four of the Second District decided *Harris, supra,* 138 Cal.App.4th 28, a lawsuit by telemarketers hired to sell subscriptions to the defendant financial newspaper Investor's Business Daily, Inc. (IBD). The plaintiffs there were compensated on a point system which rewarded them for selling longer subscriptions, winning daily contests, and meeting weekly order goals. They were also subject to "chargeback" from the points earned if the customer cancelled the subscription within 16 weeks. (*Id.* at p. 31.) As germane to the issues here, the plaintiffs filed a class action lawsuit that included various claims under the Labor Code, one of which was for "unlawful commission deduction." (*Ibid.*) The trial court granted summary adjudication for the defendant on this claim (*id.* at pp. 33–34), but the Court of Appeal reversed. (*Id.* at p. 31.)

The Court of Appeal first noted that the defendant's personnel policy changed in 2001—not incidentally, after the lawsuit was filed—to provide for the first time that the commissions would be " 'advanced.' " (*Harris, supra,* 138 Cal.App.4th at p. 40, italics omitted.) This, the plaintiffs had contended, meant that the earlier policy indicated that money paid for commissions were "wages," not an advance. (*Ibid.*) The court then briefly referred to *Steinhebel, supra,* 126 Cal.App.4th 696, which it distinguished as including the word "advance" in the employment agreement. (*Harris, supra,* 138 Cal.App.4th at p. 41.) Then, after distinguishing *Hudgins, supra,* 34 Cal.App.4th 1109, the *Harris* court concluded as follows: "Unlike the employees in *Steinhebel* and *Hudgins,* appellants did not expressly agree to the chargeback policy in writing. Even if they knew about the policy, IBD's materials suggested that the points were earned at the time of the sale, not at some designated point in the future. . . . [¶] The trial court erred in granting summary adjudication on the unlawful wage deduction claim. Respondents failed to demonstrate that they were entitled to judgment as a matter of law. A triable issue of fact exists as to whether the chargeback plan in effect during appellants' employment violates Labor Code section 221." (*Harris, supra,* 138 Cal.App.4th at p. 41.)

Appellants rely heavily on *Harris, supra,* 138 Cal.App.4th 28, devoting most of their reply brief to the case, arguing that "the trial court should be overruled based upon the recent case of *Harris v. Investors Business Daily.*" We are not persuaded.

It is perhaps enough to note that *Harris* merely reversed a summary adjudication, on the basis that a "triable issue of fact exists as to whether the chargeback plan . . . violates Labor Code section 221." (*Harris, supra,* 138 Cal.App.4th at p. 41.) The setting here is clearly distinguishable, Judge Dondero having made extensive factual determinations after a full-blown trial. *Harris* is also inapposite factually, the court there noting that, "Unlike

the employees in *Steinhebel* and *Hudgins*, appellants did not expressly agree to the chargeback policy in writing. Even if they knew about the policy, IBD's materials suggested that the points were earned at the time of the sale, not at some designated point in the future. . . ." (*Harris, supra,* 138 Cal.App.4th at p. 41.) Here, like the employees in *Steinhebel* and *Hudgins*, Appellants did expressly agree to the policy in writing. And here the policy expressly, and clearly, stated that the commissions were not earned at the time of sale—as Appellants expressly admitted.

■ The commission plans between Appellants and Verio provided that, although commissions would be paid at booking (or, in 2002, installation), they were not in fact earned at that time. This is what Appellants agreed. This is what Appellants understood. And this is what Appellants admitted at trial. We conclude that Verio's commission plans are enforceable, and that Verio is entitled to the chargebacks despite that the word "advance" is not used. Appellants agreed to what they agreed to, and that agreement will be enforced, as have such agreements over the years, as recognized by the DLSE.

■ The DLSE is the state agency empowered to enforce California's labor laws. (*Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 561–562 [59 Cal.Rptr.2d 186, 927 P.2d 296].) As such it frequently issues opinions and letters from which we can properly obtain guidance.[7] In the DLSE Employment Policies and Interpretations Manual (2002 rev.), the DLSE expressly recognized that the right to commissions may be conditioned, in section 34.3.1, which provides as follows: "Computation of commissions frequently relies on such criteria as the date the goods are delivered or the payment is received. Sometimes, the commission of the selling salesperson is subject to reconciliation and chargebacks if the goods are returned. If these conditions are clear and unambiguous, they may be utilized in computing the payment of the commission."

The above paragraph in the manual confirms various other statements in various opinions issued by the DLSE before and since, which opinions, though admittedly rendered in response to the particular fact pattern in which

---

[7] Use of DLSE opinions was discussed by Division One of this court, in *Bell v. Farmers Ins. Exchange* (2001) 87 Cal.App.4th 805, 815 [105 Cal.Rptr.2d 59]: "Advisory opinions . . . ' "while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." [Citation.]' (*Yamaha Corp. of America v. State Bd. of Equalization* [(1998)] 19 Cal.4th [1] at p. 14 [78 Cal.Rptr.2d 1, 960 P.2d 1031].) Thus, in *Morillion v. Royal Packing Co.* [(2000)] 22 Cal.4th [575] at page 584 [94 Cal.Rptr.2d 3, 995 P.2d 139], the court reviewed two DLSE advice letters and found support in the fact that the DLSE interpretation was consistent with its independent analysis. [Citation.]" (Fn. omitted.)

the opinion was sought, contain various observations supportive of our conclusion here. The following observations from the referenced opinion letters are illustrative:

"A commission is 'earned' when the employee has perfected the right to payment; that is, when all of the *legal* conditions precedent have been met. Such conditions precedent are a matter of contract between the employer and employee, subject to various limitations imposed by common law or statute." (DLSE Opn. Letter No. 1999.01.09, p. 2.)

"It would be permissible for an employer to have a commission policy which provided that in the event that an account was not paid, the commissions paid on that account would be recovered from future commissions paid to the salesperson." (DLSE Opn. Letter No. 2002.06.13-2, p. 2.)

"Commissions are due and payable after the reasonable conditions precedent of the employment agreement have been met." (DLSE Opn. Letter No. 2002.12.09-2, p. 2.)

"Reasonable conditions may be placed upon the right to recover commissions." (DLSE Opn. Letter No. 2003.04.30, fn. 1.)

Appellants assert that, notwithstanding their understandings and agreements, the commissions were wages because Verio did not refer to them as "advances," absence of which word Appellants cite to attempt to distinguish *Steinhebel, supra,* 126 Cal.App.4th 696. Such distinction is misplaced as we concluded above. Appellants expressly agreed, and understood, that commissions were not earned until the customer paid. They also understood that Verio was paying them in advance of when the commissions were earned.

Appellants assert at various places in their opening brief that conditioning payment of commissions on receipt of payment from customers improperly shifts the company's business losses to its sales associates, citing several cases in which courts have held that an employer cannot deduct from employee pay to cover certain kinds of general business losses. None is pertinent here.

*Kerr's Catering Service v. Department of Industrial Relations* (1962) 57 Cal.2d 319 [19 Cal.Rptr. 492, 369 P.2d 20] (*Kerr's Catering*) held only that it was unlawful for an employer to make deductions from agreed-upon commissions to cover cash shortages from a food vendor's truck, relying on a specific regulatory prohibition against reductions from wages for cash shortages unless those shortages were caused by the employee's dishonest or willful acts. *Quillian v. Lion Oil Company* (1979) 96 Cal.App.3d 156 [157

Cal.Rptr. 740], relying on the same regulatory prohibition, held that it was unlawful for the employer to reduce an employee's promised bonus by shrinkage at a gas station. *Ralphs Grocery Co. v. Superior Court* (2003) 112 Cal.App.4th 1090 [5 Cal.Rptr.3d 687], a demurrer case, held that allegations that an employer's bonus program based in part on each store's workers' compensation expenses and cash shortages stated a claim for violation of specific prohibitions on deductions in section 3751. And *Hudgins, supra,* 34 Cal.App.4th 1109, involved a commission deduction system which we held violated section 221 because it included a policy of deducting from paid commissions an amount for customer returns for which the particular sales person would not be entitled. Doing so, however, we noted facts which support our conclusion that Verio's plan did not violate that section. That is, while we held that recovery of wages to cover unidentified returns was unlawful because the people from whom the company recovered its losses had not received any commission on, or been involved with, the sale at issue, we noted that the store's practice of recovering commissions on identified returns *was* acceptable because those chargebacks were specifically tied to the sales in which the associate had been involved and for which the associate had received a direct benefit in the form of a commission. (*Hudgins, supra,* 34 Cal.App.4th at pp. 1121–1122, fn. 9.) Here, of course, the chargebacks are sales associate by sales associate, order by order.

Finally, we note Appellants can find no support in *Barnhill v. Robert Saunders & Co.* (1981) 125 Cal.App.3d 1 [177 Cal.Rptr. 803], the case relied on at oral argument. Barnhill, a bookkeeper for the defendant, had signed a promissory note to the defendant which provided in part that it was payable "by payroll deduction or on demand." Subsequently, the parties orally agreed that the defendant would deduct $37.50 from Barnhill's wages every two weeks. Barnhill was discharged, at which time the balance due on the note was $475 plus interest. At that time, Barnhill was owed two weeks' wages of $475. When Barnhill went to pick up her check, she was given a stub with a net zero balance, indicating various deductions including a $442.46 setoff against the balance owing on the note. (*Id.* at p. 4.) Affirming a Labor Commission decision for Barnhill, Division Three of this court held that "[t]he policy underlying the state's wage exemption statutes is to insure that regardless of the debtor's improvidence, the debtor and his or her family will retain enough money to maintain a basic standard of living, so that the debtor may have a fair chance to remain a productive member of the community. [Citation.] Moreover, fundamental due process considerations underlie the prejudgment attachment exemption. Permitting appellant to reach respondent's wages by setoff would let it accomplish what neither it nor any other creditor could do by attachment and would defeat the legislative policy underlying that exemption. We conclude that an employer is not entitled to a

setoff of debts owing it by an employee against any wages due that employee." (125 Cal.App.2d at p. 6.) *Barnhill* has nothing to do with the setting here.

█ As our Presiding Justice Kline has confirmed, "Section 221 was enacted in order to prevent employers from utilizing secret deductions or kickbacks to pay employees less than their stated wages." (*Finnegan v. Schrader* (2001) 91 Cal.App.4th 572, 584 [110 Cal.Rptr.2d 552], citing *Kerr's Catering, supra,* 57 Cal.2d at p. 328; accord, *Steinhebel, supra,* 126 Cal.App.4th at p. 707.) As demonstrated by the extensive evidence set forth above, there was nothing "secret" about Verio's conduct here. Nor were there any "kickbacks." We conclude, as did the court in *Steinhebel,* that "[i]n referring to 'wages' paid, section 221 prohibits an employer only from collecting or receiving wages that have already been earned by performance of agreed-upon requirements." (*Steinhebel, supra,* 126 Cal.App.4th at p. 707.) The commissions here were not so earned, as Appellants expressly admitted.

### C. *Section 224 Provides an Independent Basis to Affirm the Chargebacks*

Judge Dondero concluded that section 224 provided an independent basis to uphold Verio's chargebacks. Appellants contend that conclusion was error. We disagree.

█ Section 224 provides in pertinent part as follows: "The provisions of Sections 221, 222, and 223 shall in no way make it unlawful for an employer to withhold or divert any portion of an employee's wages when . . . a deduction is expressly authorized in writing by the employee to cover . . . deductions not amounting to a rebate or deduction from the standard wage . . . ." Thus, even if payments are "wages," an employer may withhold or divert them if the two conditions in section 224 are met: the deduction (1) is authorized in writing, and (2) does not reduce the employee's standard wage. Both conditions are present here.

*Prudential Ins. Co. v. Fromberg, supra,* 240 Cal.App.2d 185 is persuasive. There, Fromberg was employed as Prudential's agent under two salary plans under which Prudential made advance payments on commissions. When Fromberg's employment was terminated, Prudential claimed it could withhold commissions otherwise due him to offset the indebtedness arising from advances the company had previously made. (*Id.* at p. 188.) The Court of Appeal affirmed a declaratory judgment for Prudential, holding in part that the offsets were proper under section 224 because they were made pursuant to a written agreement and were not a deduction of the employee's standard wage. (240 Cal.App.2d at p. 187.) The same applies here.

Verio's chargebacks were made pursuant to written commission plans which expressly authorized them. And the chargebacks were not taken against the employee's standard wage. Although "standard wage" is not defined in section 224, and we can find no authority defining it, common usage of the term refers to an employee's base pay, as shown by the testimony of Appellants, who referred to their base pay as their "standard" wage.[8]

### D. *There Is No Unconscionability*

Appellants contend that Judge Dondero erred in failing to recognize that any contract, if one did exist, was an unconscionable contract. Such contention cannot succeed, either procedurally or substantively.

#### 1. *Appellants Have Not Preserved Any Claim Of Unconscionability*

Responding to Appellants' claim of unconscionability, Verio first contends that no such argument was made below and was thus waived. Such contention is well taken, for several reasons.

First, Appellants' brief on this point asserts, in the most conclusory way, that, "unlike the *Steinhebel* case, [Appellants] here argued unconscionability." However, no record reference is set forth in support of such statement. Second, Appellants' reply brief does not even respond to Verio's claim of waiver. Third, Appellants do not demonstrate that they argued unconscionability below. Their own proposed findings of fact and conclusions of law do not even mention the word, which is perhaps not surprising, as neither their complaint nor their answer to Verio's cross-complaint refers to any claimed unconscionability. (Compare *Harris, supra,* 138 Cal.App.4th at p. 40, where the plaintiffs, represented by the same counsel as Appellants here, alleged in the second and third causes of action that "IBD's chargeback policy was unlawful and unconscionable.")

██ In *California Grocers Assn. v. Bank of America* (1994) 22 Cal.App.4th 205 [27 Cal.Rptr.2d 396] (*California Grocers*), we discussed at length Civil Code section 1670.5, the statutory codification of the doctrine of unconscionability, which provides that a court may refuse to enforce "an unconscionable contract." We noted that, while that statute does not in itself create an affirmative cause of action, it "codifies the defense of unconscionability." (*California Grocers, supra,* 22 Cal.App.4th at p. 217.) ██ Thus,

---

[8] Appellants assert that section 224 applies only to deductions for employee benefits. However, section 224 is not so limited, as held in *Prudential v. Fromberg, supra,* 240 Cal.App.2d 185, where the court applied section 224 to allow the employer to recover unearned advances.

we conclude that, whether attempted to be used affirmatively or defensively, the issue of unconscionability must be put before the trial court or it will be waived. ■■■ "The rule is well settled that the theory upon which a case is tried must be adhered to on appeal. A party is not permitted to change his position and adopt a new and different theory on appeal. To permit him to do so would not only be unfair to the trial court, but manifestly unjust to the opposing litigant." (*Ernst v. Searle* (1933) 218 Cal. 233, 240–241 [22 P.2d 715]; see generally 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 399, pp. 451–452.) And this rule "is to be stringently applied when the new theory depends on controverted factual questions whose relevance thereto was not made to appear at trial." (*Bogacki v. Board of Supervisors* (1971) 5 Cal.3d 771, 780 [97 Cal.Rptr. 657, 489 P.2d 537].) This, of course, is the situation here. But even if the contention were properly before us, it would fail, as Appellants have not shown unconscionability.

### 2. *The Agreement Was Not Unconscionable*

■■■ "Unconscionability analysis begins with an inquiry into whether the contract is one of adhesion" (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 113 [99 Cal.Rptr.2d 745, 6 P.3d 669] (*Armendariz*)), an issue which, as Verio points out, was not the direct subject of any meaningful testimony below, in light of Appellants failure to assert unconscionability.

Unconscionability has both a procedural and a substantive element. The procedural element focuses "on ' "oppression" ' or ' "surprise" ' due to unequal bargaining power," and the substantive element "on ' "overly harsh" ' or ' "one-sided" ' results." (*Armendariz, supra*, 24 Cal.4th at p. 114.) Both elements must be present, but they need not be present in the same degree. "[T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." (*Ibid.*)

Here, as demonstrated by the abundant evidence set forth above, there was nothing surprising about the commission plans, and nothing oppressive. Thus, there was no procedural unconscionability. Likewise no substantive unconscionability, as demonstrated by *American Software, supra,* 46 Cal.App.4th 1386, discussed above, which is dispositive.

In *American Software*, the plaintiff Ali was employed as a salesperson under an employment contract which terminated her right to receive commissions on payments on her accounts 30 days after severance of employment. (*American Software, supra,* 46 Cal.App.4th at pp. 1388–1389.) The plaintiff resigned, following which she sought the commissions on payments received

more than 30 days after she left. (*Id.* at p. 1389.) The Labor Commission denied the plaintiff's claim, but on de novo review the trial court reversed, finding the contract provision regarding post employment commissions unconscionable. (*Id.* at pp. 1389–1390.) The Court of Appeal reversed. (*Id.* at p. 1388.)

 The court first concluded that there was no procedural unconscionability because the plaintiff was aware of her obligations under the contract and voluntarily agreed to assume them. (*American Software, supra,* 46 Cal.App.4th at pp. 1391–1392.) Then, and particularly apposite here, the court concluded there was no substantive unconscionability either. (*Id.* at p. 1392.) Relying on our decision in *California Grocers, supra,* 22 Cal.App.4th 205—a case not even mentioned by Appellants—the court confirmed that "[s]ubstantive unconscionability" is shown only by contract terms so one-sided as to " 'shock the conscience.' " (*American Software, supra,* at p. 1391, italics omitted.) "With a concept as nebulous as 'unconscionability' it is important that courts not be thrust in the paternalistic role of intervening to change contractual terms that the parties have agreed to merely because the court believes the terms are unreasonable. The terms must shock the conscience." (*Ibid.*)

Among other things, *American Software* cited to the official notes to Uniform Commercial Code section 2-302 (on which Civ. Code, § 1670.5 is based), which provide that contract terms are to be evaluated " 'in the light of the general commercial background and the commercial needs of the particular trade or case . . . .' " (*American Software, supra,* 46 Cal.App.4th at p. 1392.) Here, as noted, Linos testified that three months of consecutive payment was the industry standard before a commission was earned. Further, the court in *American Software* observed that the contract provision challenged by Ali was commonplace in employment contracts with sales representatives who have ongoing responsibilities to service the account once the sale is made. (*Id.* at p. 1393.) The same is true here. Finally, the court criticized the holding in *Ellis v. McKinnon Broadcasting Co.* (1993) 18 Cal.App.4th 1796 [23 Cal.Rptr.2d 80], a case Appellants rely on here, on two bases: (1) *Ellis* had followed the analytical structure whether the commission was " 'reasonable,' " which approach was specifically rejected in favor of our more rigorous " 'shock the conscience' " standard; and (2) the result in *Ellis* is hard to reconcile with other California appellate decisions that have shown considerable restraint in second-guessing provisions in employment contracts governing payment of sales commissions upon termination of employment. (*American Software, supra,* 46 Cal.App.4th at p. 1394. See Prince, *Unconscionability in California: A Need for Restraint and Consistency* (1995) 46 Hastings L.J. 459.)

E.–G.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## V. Disposition

Appeal No. A108972 is dismissed. The judgment for Verio is affirmed in all respects. Verio shall recover its costs and attorneys' fees on appeal.

Kline, P. J., and Lambden, J., concurred.

Appellants' petition for review by the Supreme Court was denied November 29, 2006, S147505.

---

*See footnote, *ante*, page 1313.